**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
04/03/2025
CT Log Number 548796190

## Service of Process Transmittal Summary

**TO:**    Brette Kranz, Legal Executive Assistant
Minerals Technologies Inc.
622 3rd Ave Fl 38
New York, NY 10017-6729

**RE:**    **Process Served in Delaware**

**FOR:**    Minerals Technologies Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: JOHN E. MARICICH, JR.; and KYM MARICICH BENEDICT // To: Minerals Technologies Inc. |
| **CASE #:** | 25CV116787 |
| **NATURE OF ACTION:** | Asbestos Litigation - Personal Injury |
| **PROCESS SERVED ON:** | The Corporation Trust Company, Wilmington, DE |
| **DATE/METHOD OF SERVICE:** | By Process Server on 04/03/2025 at 09:54 |
| **JURISDICTION SERVED:** | Delaware |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Brette Kranz  Brette.Kranz@Mineralstech.com |
| | Email Notification,  Thomas Meek  thomas.meek@mineralstech.com |
| | Email Notification,  Timothy Jordan  Timothy.Jordan@mineralstech.com |
| | Email Notification,  Judy Geiser  judy.geiser@mineralstech.com |
| | Email Notification,  Joseph Meadows  Joseph.Meadows@mineralstech.com |
| **REGISTERED AGENT CONTACT:** | The Corporation Trust Company |
| | 1209 Orange Street |
| | Wilmington, DE 19801 |
| | 866-401-8252 |
| | LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                                Thu, Apr 3, 2025
**Server Name:**                         Selena Cabrera

| Entity Served | MINERALS TECHNOLOGIES INC. |
|---|---|
| Case Number | 25CV116787 |
| Jurisdiction | DE |

| Inserts | | |
|---|---|---|
| | | |



SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CHATTEM, INC., individually, as alter ego of, and as successor-in-interest to THE GOLD BOND STERILIZING POWDER COMPANY a/k/a THE GOLD BOND COMPANY, et al. (See attached Additional Parties Attachment for complete list of defendants.)

**YOU ARE BEING SUED BY PLAINTIFFS:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOHN E. MARICICH, JR.; and KYM MARICICH BENEDICT

---

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
**03/25/2025**
Chad Finke, Executive Officer / Clerk of the Court
By: _____ A. Kargbo _____ Deputy

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT<br>County of Alameda<br>Renè C. Davidson Courthouse<br>1225 Fallon St.<br>Oakland, 94612 | CASE NUMBER:<br>*(Número del Caso):* **25CV116787** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
William H. Cross, Esq.  C.S.B. #337801 510-302-1000 510-835-4913
Kazan, McClain, Satterley & Greenwood, A Professional Law Corporation
55 Harrison St, Suite 400, Oakland CA 94607

| DATE: 03/25/2025<br>*(Fecha)* | Chad Finke, Executive Officer / Clerk of the Court | Clerk, by<br>*(Secretario)* | A. Kargbo<br>A. Kargbo | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

---


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

    MINERALS TECHNOLOGIES INC.
3. ☒ on behalf of *(specify):*

    under: ☒ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
    ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
    ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
    ☐ other *(specify):*
4. ☑ by personal delivery on *(date):* April 3, 2025

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | SUMMONS | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

**SUM-200(A)**

| | |
|---|---|
| SHORT TITLE: JOHN E. MARICICH, JR.; and KYM MARICICH BENEDICT v. CHATTEM, INC., individually, as alter ego of, and as successor-in-interest to THE GOLD BOND STERILIZING POWDER COMPANY a/k/a THE GOLD BOND COMPANY, et al. | CASE NUMBER: |

### INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

## LIST OF ALL DEFENDANTS:

CHATTEM, INC., individually, as alter ego of, and as successor-in-interest to THE GOLD BOND STERILIZING POWDER COMPANY a/k/a THE GOLD BOND COMPANY;

SHULTON INC., individually, as alter ego of, and as successor-in-interest to SHULTON GROUP and/or SHULTON, INC.;

MERCK & CO., INC., individually, as alter-ego of, and as successor-in-interest to SCHOLL, INC. and SCHERING-PLOUGH CORPORATION;

L'OREAL USA, INC., individually and as successor-in-interest, parent, alter ego, and equitable trustee of WARNER COSMETICS ENTERPRISES, INC., WARNER COSMETICS INCORPORATED, and PARFUMS PALOMA PICASSO, INC.;

PFIZER, INC.;

ALBERTSONS COMPANIES, INC.,

CVS PHARMACY, INC.;

LONGS DRUG STORES CALIFORNIA, L.L.C., individually, as alter-ego of, and as successor-in-interest to LONGS DRUG STORES CALIFORNIA, INC.;

MINERALS TECHNOLOGIES INC.;

PERRIGO COMPANY OF TENNESSEE, individually, as alter-ego of, and as successor-in-interest to CUMBERLAND-SWAN INC. and CMC, INC.;

PTI UNION, LLC, a/k/a PHARMA TECH INDUSTRIES;

SAFEWAY INC.;

TARGET CORPORATION;

THRIFTY CORPORATION;

SPECIALTY MINERALS INC.;

VI-JON, INC., individually, as alter-ego of, and as successor-in-interest to CUMBERLAND SWAN HOLDINGS, INC.;

WALMART INC.;

FIRST DOE through ONE HUNDREDTH DOE,

**Page 1 of 1**

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1  Joseph D. Satterley, Esq. (C.S.B. #286890)
      jsatterley@kazanlaw.com
2  Teresa Allen, Esq. (C.S.B. #264865)
      tallen@kazanlaw.com
3  William H. Cross, Esq. (C.S.B. #337801)
      wcross@kazanlaw.com
4  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
   A Professional Law Corporation
5  Jack London Market
   55 Harrison Street, Suite 400
6  Oakland, California 94607
   Telephone: (510) 302-1000
7  Facsimile: (510) 835-4913

8  Attorneys for Plaintiffs

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**03/25/2025 at 08:07:19 PM**
By: Abdul Kargbo,
Deputy Clerk

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                          COUNTY OF ALAMEDA

11

12  JOHN E. MARICICH, JR.; and                    Case No. 25CV116787

13  KYM MARICICH BENEDICT,                        **COMPLAINT FOR PERSONAL
                                                  INJURIES AND LOSS OF CONSORTIUM**
14                    Plaintiffs,
                                                  **DEMAND FOR JURY TRIAL**
15          vs.

16  CHATTEM, INC., individually, as alter ego
    of, and as successor-in-interest to THE GOLD
17  BOND STERILIZING POWDER
    COMPANY a/k/a THE GOLD BOND
18  COMPANY;

19  SHULTON INC., individually, as alter ego of,
    and as successor-in-interest to SHULTON
20  GROUP and/or SHULTON, INC.;

21  MERCK & CO., INC., individually, as alter-
    ego of, and as successor-in-interest to
22  SCHOLL, INC. and SCHERING-PLOUGH
    CORPORATION;

23
    L'OREAL USA, INC., individually and as
24  successor-in-interest, parent, alter ego, and
    equitable trustee of WARNER COSMETICS
25  ENTERPRISES, INC., WARNER
    COSMETICS INCORPORATED, and
26  PARFUMS PALOMA PICASSO, INC.;

27  PFIZER, INC.;

28  ALBERTSONS COMPANIES, INC.,

*Kazan, McClain, Satterley & Greenwood*
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  CVS PHARMACY, INC.;

2  LONGS DRUG STORES CALIFORNIA,
   L.L.C., individually, as alter-ego of, and as
3  successor-in-interest to LONGS DRUG
   STORES CALIFORNIA, INC.;
4
   MINERALS TECHNOLOGIES INC.;
5
   PERRIGO COMPANY OF TENNESSEE,
6  individually, as alter-ego of, and as successor-
   in-interest to CUMBERLAND-SWAN INC.
7  and CMC, INC.;

8  PTI UNION, LLC, a/k/a PHARMA TECH
   INDUSTRIES;
9
   SAFEWAY INC.;
10
   TARGET CORPORATION;
11
   THRIFTY CORPORATION;
12
   SPECIALTY MINERALS INC.;
13
   VI-JON, INC., individually, as alter-ego of,
14 and as successor-in-interest to
   CUMBERLAND SWAN HOLDINGS, INC.;
15
   WALMART INC.;
16
   FIRST DOE through ONE HUNDREDTH
17 DOE,

18              Defendants.

19

20                **GENERAL BACKGROUND**

21                           I.

22     **The Plaintiffs**: John E. Maricich, Jr. ("Plaintiff" herein) is the physically injured Plaintiff.

23 He has malignant mesothelioma that was caused by his cumulative exposures to asbestos,

24 asbestiform fibers, asbestiform talc, asbestos-containing talc, and asbestos-containing limestone –

25 collectively referred to herein as asbestos – including the asbestos exposures for which Defendants

26 bear responsibility. Plaintiff's spouse is Kym Maricich Benedict. Plaintiffs live in California.

27                          II.

28     **The Defendants**: All Defendants are listed in the case caption. The true names of the

                                 2

Defendants sued as DOE's are unknown to Plaintiff. Each Defendant was the agent, employee, or joint venturer of its co-Defendants and acted in the full course and scope of the agency, employment, or joint venture.

**III**.

**Alternate Entities**: All Defendants are individually liable for their defective products and wrongful conduct, and some Defendants are liable for the defective products and wrongful conduct of their alternate entities. Each such Defendant is liable for the torts of each of its alternate entities because:

- there were express or implied agreements between the companies to transfer and assume the liabilities;

- the transactions between the companies amounted to a consolidation or merger;

- the purchasing company is a mere continuation of the seller;

- the transfer of assets to the purchasing company was for the fraudulent purpose of escaping liability for the seller's debts;

- strict products liability was transferred because (1) there was a virtual destruction of Plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor has the ability to assume the original manufacturer's risk-spreading role, and (3) it is fair to require the successor to assume responsibility for defective products that was a burden necessarily attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business; and

- the companies are alter egos because (1) there is such a unity of interest, ownership, and business operations between the companies that their separate personalities do not in reality exist, and (2) there would be an inequitable result if the torts in question were treated as those of one company alone.

The identities of the Defendants and their alternate entities are as follows:

| Defendant | Alternate Entities |
|---|---|
| CHATTEM, INC. | THE GOLD BOND STERILIZING POWDER COMPANY a/k/a THE GOLD BOND COMPANY |
| L'OREAL USA, INC., | WARNER COSMETICS ENTERPRISES, INC. WARNER COSMETICS INCORPORATED PARFUMS PALOMA PICASSO, INC. |
| LONGS DRUG STORES CALIFORNIA, L.L.C., | LONGS DRUG STORES CALIFORNIA, INC. |

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

| Defendant | Alternate Entities |
|---|---|
| MERCK & CO., INC | SCHOLL, INC<br>SCHERING-PLOUGH CORPORATION |
| PERRIGO COMPANY OF TENNESSEE | CUMBERLAND-SWAN, INC.<br>CMC, INC. |
| SHULTON INC. | SHULTON GROUP<br>SHULTON, INC. |
| VI-JON, INC. | CUMBERLAND SWAN HOLDINGS, INC. |

**IV.**

**Venue**: Venue is proper in Alameda County because certain Defendants reside in Alameda County, and because some of Plaintiff's exposures to Defendants' asbestos occurred in locations including Alameda County.

**V.**

**The Asbestos Exposures**: Plaintiff was exposed, exclusively in California, to significant levels of asbestos dust because of his use of asbestos-containing cosmetic talc products. Plaintiff's above-described asbestos exposures occurred because of Defendants' products that were sold in California; and because of Defendants' conduct that occurred in, and/or that was directed toward, California. At all times, Defendants purposefully availed themselves of the California market, through marketing and sales of Defendants' relevant products, and through Defendants' relevant conduct. Additionally, Defendants are "at home" in California, because California is one of their largest, if not the largest, markets in the United States; and because certain Defendants reside in California.

Plaintiff John E. Maricich, Jr. developed malignant mesothelioma as a result of exposure to asbestiform fibers through his use of, and exposure to the Defendants' asbestos-containing products, asbestos-containing talc, finished and unfinished talcum powder products, and/or asbestos-containing cosmetics, including:

**ALBERTSONS COMPANIES, INC.** (*as a supplier of asbestos-containing talcum powder, including its own generic brands of talcum powder*); **CHATTEM, INC.** (individually and as successor-in-interest, parent, alter ego, and equitable trustee of THE GOLD BOND

Kazan, McClain, Satterley & Greenwood<br>A Professional Law Corporation<br>Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607<br>(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

4

1   STERILIZING POWDER COMPANY a/k/a THE GOLD BOND COMPANY) (*for its asbestos-*

2   *containing talcum powder, including but not limited to, Gold Bond*); **CVS PHARMACY, INC**. (*as*

3   *a supplier of asbestos-containing talcum powder, including its own generic brands of talcum*

4   *powder*); **LONGS DRUG STORES CALIFORNIA, L.L.C.** (individually, as alter-ego of, and as

5   successor-in-interest to LONGS DRUG STORES CALIFORNIA, INC.) (*as a supplier of asbestos-*

6   *containing talcum powder, including its own generic brands of talcum powder*); **L'OREAL USA,**

7   **INC.** (individually and as successor-in-interest, parent, alter ego, and equitable trustee of WARNER

8   COSMETICS ENTERPRISES, INC., WARNER COSMETICS INCORPORATED, and

9   PARFUMS PALOMA PICASSO, INC..) (*for its asbestos-containing talcum powder, including but*

10  *not limited to, Paloma Picasso*); **MERCK & CO., INC.** (individually, as alter-ego of, and as

11  successor-in-interest to SCHOLL, INC. and SCHERING-PLOUGH CORPORATION) (*for its*

12  *asbestos-containing talcum powder, including but not limited to, Dr. Scholls Foot Powder*);

13  **MINERALS TECHNOLOGIES INC.** (*as a supplier of asbestos-containing talc*); **PERRIGO**

14  **COMPANY OF TENNESSEE** (individually, as alter-ego of, and as successor-in-interest to

15  CUMBERLAND-SWAN, INC. and CMC, INC.) (*for its asbestos-containing talcum powder*);

16  **PFIZER, INC.** (*as a supplier of asbestos-containing talc*); **PTI UNION, LLC** (*as a supplier of*

17  *asbestos-containing talcum powder*); **SAFEWAY INC.** (*as a supplier of asbestos-containing*

18  *talcum powder, including its own generic brands of talcum powder*); **SPECIALTY MINERALS,**

19  **INC.** (*as a supplier of asbestos-containing talc*); **TARGET CORPORATION** (*as a supplier of*

20  *asbestos-containing talcum powder, including its own generic brands of talcum powder*);

21  **THRIFTY CORPORATION** (*as a supplier of asbestos-containing talcum powder, including its*

22  *own generic brands of talcum powder*); **SHULTON INC.** (individually, as alter ego of, and as

23  successor-in-interest to SHULTON GROUP and/or SHULTON, INC.) (*for its asbestos-containing*

24  *talcum powder, including but not limited to, Old Spice*); **VI-JON, INC.** (individually, as alter-ego

25  of, and as successor-in-interest to CUMBERLAND SWAN HOLDINGS, INC.) (*for its asbestos-*

26  *containing talcum powder*); and **WALMART INC.** (*as a supplier of asbestos-containing talcum*

27  *powder, including its own generic brands of talcum powder*).

28          Regarding Defendants **MINERALS TECHNOLOGIES INC.** and **SPECIALTY**

5

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

**MINERALS INC.** (hereinafter known as the "Testing Defendants"), Plaintiff specifically ***disclaims*** and does **_not_** allege that these Defendants manufactured, supplied, sold, distributed, and/or otherwise marketed talcum powder products. Testing Defendants were responsible for asbestos-analysis of raw and processed talc that was eventually supplied and used in the manufacture of cosmetic talcum powder products exposing Plaintiff John E. Maricich, Jr. Testing Defendants' negligence and fraud in testing and representing that this raw and processed talc was "asbestos-free" and/or "asbestos non-detect" caused Plaintiff to be further exposed to asbestos fibers leading to his disease. Testing Defendants purposefully availed themselves of California as, at times, Defendants' conduct occurred in, and/or was directed toward, California. At all times, Defendants purposefully availed themselves of the California market, through marketing of Defendants' relevant services, and through Defendants' relevant conduct. Further, Testing Defendants knew that the raw and processed talc they tested were bound for California markets and/or came from California mines.

## VI.

**The Harm**: Plaintiff has malignant mesothelioma caused by his exposures to asbestos. The mesothelioma has caused, and will cause, Plaintiff to experience financial harm. The mesothelioma also has caused, and will cause, Plaintiff to experience physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, emotional distress, and other similar harm. And the mesothelioma will cause Plaintiff's untimely death.

Plaintiff's injuries have caused, and will cause, Kym Maricich Benedict to experience loss of consortium. Her harm includes the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, sexual relations, and other similar harm.

Plaintiffs rely upon the liability theories described below.

## VII.

**State-of-the-Art Knowledge of Asbestos Hazards**: The following facts are illustrative, but not exhaustive, of the evolution of the knowledge of the health hazards of asbestos and what was known and knowable to Defendants:

1.    Health hazards from asbestos exposure were identified in the 1890's.

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

During this time, the Lady Inspector of Factories in Great Britain noted that individuals working with asbestos were suffering various lung injuries.

2.      Defendants since the early 1900's possessed medical and scientific data that raised concerns regarding the presence of asbestos in talcum powder and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. Talc is used in the manufacture of goods such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in consumer powder products, talc is known as "talcum powder."

3.      Geologists and mining companies, including Defendants, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite, and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800's in the United States, note the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

4.      As early as the 1920's, the term "asbestosis" was used to describe pulmonary fibrosis caused by asbestos exposure. Case reports in Great Britain and the United States detailed asbestosis in various workers.

5.      By 1929, lawsuits for disability related to exposure to asbestos were filed against Johns Manville.

6.      In the late 1930's, case reports were published addressing the relationship between asbestos and cancer.

7.      Several reports, studies, and guidelines published as early as the 1930's, including California's Dust, Fumes, Vapors, and Gases Safety Orders, all recognized that asbestos is a dust which creates health hazards, and that certain precautions are required to mitigate human exposure to dust. Such measures include, but are not limited to, using water to suppress the dust at its source, as well as providing those who might be exposed to dust with adequate ventilation, showers, and changing facilities. These same measures that were recommended to protect workers from asbestosis in the 1930's would also have substantially reduced the risk that bystanders, household members, and other persons would contract mesothelioma from inhaling asbestos-containing dust that those who worked with and around asbestos and asbestos-containing products carried into their households on their person and personal effects. Defendants, and each of them, knew or should have known that anyone, including household members of those who used asbestos-containing products were at risk of developing an asbestos-related disease after inhaling dust from such asbestos-containing products.

8.      In 1931, the United Kingdom allowed workers to receive compensation for asbestosis.

9.      In March of 1933, Waldemar C. Dreesen of the United States Public Health

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Service reported to the National Safety Council the results of a study conducted among tremolite, talc, and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated, "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

10.    As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium."

11.    In the September 1935 issue of National Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

12.    In 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard of care for work with asbestos.

13.    Also in 1936, Illinois enacted legislation recognizing asbestosis as a compensable occupational disease under its Occupational Disease Act.

14.    By the 1940's, asbestos carcinogenicity was noted in reviews in fields of industrial medicine, cancer research, and pneumoconiosis.

15.    In 1946, the private American Conference of Governmental Industrial Hygienists established a maximum allowable concentration for occupational exposure.

16.    During the 1940's and 1950's, asbestos hazards were discussed in popular magazines, including Scientific American (January 1949) and Newsweek (May 15, 1950), as well as the Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the New Yorker.

17.    In addition, beginning in the 1940's and 1950's, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

18.    In 1955, Richard Doll published a study linking asbestos to lung cancer.

19.    In 1960, Chris Wagner published a study linking asbestos to mesothelioma.

20.    In the early 1960's, Dr. Irving Selikoff engaged in studies of groups of

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

8

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the Annals of the New York Academy of Sciences published in 1965.

21.     In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a..fiber content..averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits..Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).]

22.     In 1969, product-liability lawsuits were brought against asbestos manufacturers. Also, under the Walsh Healy Act, federal contractors with contracts of more than $10,000 were required to adhere to a workplace standard of no more than 12 fibers per cubic centimeter of air.

23.     In 1970, OSHA established the first Federal guidelines for workplace asbestos exposure, which took effect in 1971. Those regulations did not identify any known safe level of exposure for asbestos and mesothelioma. The OSHA asbestos regulations were strengthened during the 1970's and 1980's; and by 1986 the regulations explained: (1) the legally "permissible" levels for workplace asbestos exposures, even at just 0.2 f/cc, actually were inadequate to protect people against the risk of mesothelioma and lung cancer; (2) for carcinogens including asbestos, "no safe threshold level was demonstrable"; and (3) mesothelioma and lung cancer developed even after "low cumulative exposures to asbestos."

24.     In 1972, the private American Conference of Governmental Industrial Hygienists listed asbestos as a carcinogen. Those industry standards did not identify any known safe level of exposure for asbestos and mesothelioma.

25.     A 1976 follow-up study conducted by researchers at Mt. Sinai concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc..We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." [Rohl, A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. Toxicol. Environ. Health 255 (1976).] The results of the Mount Sinai study were soon picked up and reported by both the New York Times and the Washington Post that same year. The study and subsequent newspaper articles listed explicitly popular consumer cosmetic talcum powders as containing high percentages of asbestos.

26.     In the early 1970's, the Food and Drug Administration ("FDA") began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants, who were part of an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    industry, repeatedly conspired and worked in concert to block efforts to
2    label and warn consumers regarding the dangers associated with cosmetic
     talcum powder products.

3    All Defendants failed to place any warning on their talc and talcum powder products or

4    ever disclose the fact that these products contained asbestos, asbestiform fibers, and asbestiform

5    talc at any point, up to and including present day, despite the clear hazard and direct information

6    that their products *did* contain asbestos, asbestiform fibers, and asbestiform talc.

7                                             **VIII.**

8    **Additional Allegations as to all Defendants:** The following facts are illustrative, but not

9    exhaustive, of the Defendants' wrongful conduct.

10   As noted above, Plaintiff had numerous exposures to asbestiform fibers through his use of

11   and exposure to Defendants' talcum powder products. These products were purchased at Defendants

12   Albertsons Companies, Inc., CVS Pharmacy Inc., Longs Drug Stores California, L.L.C., Safeway

13   Inc., Target Corporation, Thrifty Corporation, and Walmart Inc.'s (hereinafter "the Retailers")

14   California stores, including those located in Alameda County.

15   All of the Retailers have been registered to do business in California and/or operate in

16   California, and have numerous retail outlets and offices in California, and as such would be aware

17   of the California Department of Industrial Relations *Dusts, Fumes, Vapors and Gases Safety Orders*

18   which by 1939 regulated both talc and asbestos as materials that should be subject to maximum

19   permissible concentrations (regarded as "toxic thresholds"), with asbestos having a maximum of 5

20   million particles per cubic foot, and talc having a maximum of 15 million particles per cubic foot.

21   The Retailers thus knew that both asbestos and talc have the potential to have toxic effects on the

22   human body when exposure occurs over these concentrations.

23   All Defendants ran advertisements in newspapers that also carried articles discussing the

24   asbestos-related hazards of cosmetic talc products, as well as the FDA's potential regulations. (See,

25   e.g., October 17, 1973 Oakland Tribune, *What's in Store for Beauty Products?*) These articles show

26   that this information was knowable and known by Defendants.

27   There were also several national newspaper and periodical articles, as well as California

28   newspaper articles from the 1970's and 1980's regarding talc/asbestos hazards. For example:

                                                10

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

July 6, 1971 New York Times, *Kretchmer Says Most Industry Here Is Resisting Efforts to Curb Pollution* (two brands of talcum showed 5-25% pure asbestos content);

June 16, 1972, New York Times, *High Levels of Asbestos Found in 3 Paints and 2 Talcums Here* (between 5-25% of baby powder believed to be asbestos);

February 24, 1973 The Washington Post, *Asbestos Hazards Found Widespread* (Selikoff to Senate Subcommittee on the Environment: asbestos is found in talcums);

February 26, 1973 The Wall Street Journal, *FDA Plans to Impose Limits on Asbestos in Certain Cosmetics* (the FDA will establish a limit of 1% on asbestos impurities in talcum powder, talcum baby powder reported to contain 2-3% asbestos);

March 8, 1976 The Washington Post, *Asbestos Fibers Found in Baby Powder* (Selikoff Study: concentrations of 2-20% asbestos fibers found in 10 of 19 talcum powder products tested);

March 10, 1976 New York Times, *Asbestos Found in Ten Powders* (reporting on Selikoff study finding 2-20% asbestos in 10 of 19 talcum powder products tested);

March 17, 1976 Chemical Week, *Cancer-link Inquiries* (reporting on Selikoff study finding 2-20% asbestos in 10 of 19 talcum powder products tested);

March 26, 1976 The Washington Post, *Talcum Study Clarified by N.Y. Hospital* (reporting on Selikoff study finding 2-20% asbestos in 10 of 19 talcum powder products tested, Selikoff notes that while FDA studies revealed no appreciable amounts of asbestos in talcum powders, the FDA's research methods aren't sensitive enough to measure asbestos below a certain level);

May 1979 Food & Cosmetics Toxicology, *Talc in the Ovaries*; (talc found in human ovaries);

January 1980 Vogue, *New Cancer Suspect* (asbestos and mineral talc are possible causes of ovarian cancer, reporting on August 18, 1979 The Lancet, *Cosmetic Talc And Ovarian Cancer*);

April 15, 1981 San Diego Union, *Skin Care is Touchy Subject* (Jerome Litt, M.D. advises everyone to stop using talcum powder because it has asbestos in it);

September 18, 1981 The Washington Post, Healthtalk: *Brushoff for Baby Powder* (reporting on Mofenson study, *Baby Powder – A Hazard!*, which study notes talc may contain asbestos and that containers of talc should include a warning that the ingredients may be hazardous if aspirated);

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

September 22, 1981 Good Morning America (broadcast), *Talcum Powder Can Be Dangerous* (reporting on Mofenson study, *Baby Powder – A Hazard!*, which study notes talc may contain asbestos and that containers of talc should include a warning that the ingredients may be hazardous if aspirated);

November 2, 1981 AP Wire, *Baby Powder Use Could Pose Peril, Doctor Warns: Maybe the baby shouldn't have its bottom dusted* (reporting on Mofenson study, *Baby Powder – A Hazard!*, which study notes talc may contain asbestos and that containers of talc should include a warning that the ingredients may be hazardous if aspirated);

August 6, 1982 AP Wire, *Talcum Powder Tied to Cancer* (reporting on Cramer study, *Ovarian Cancer and Talc: A Case-Control Study*, which study reports support for an association between talc and ovarian cancer, hypothesized because of the similarity of ovarian cancer to mesotheliomas and the chemical relation of talc to asbestos, a known cause of mesotheliomas);

August 19, 1982 New York Daily News, *How Safe is Your Baby: Household hazards include products such as mouthwash and talc* (baby powder and all talc can cause severe respiratory diseases if inhaled; use cornstarch instead);

January 1983 Self magazine, *The dust-up over beauty powders* (reporting on Cramer study, *Ovarian Cancer and Talc: A Case-Control Study*, which study reports support for an association between talc and ovarian cancer, hypothesized because of the similarity of ovarian cancer to mesotheliomas and the chemical relation of talc to asbestos, a known cause of mesotheliomas, and on Henderson and Griffiths study finding talc in ovarian cancer cells).

These articles (and broadcast) show that this information was knowable and known to all Defendants, including but not limited the Retailers.

The Retailers, as entities that are within Defendants' chain of distribution to customers like Plaintiff and Plaintiff's family owe a duty to consumers to discover defects before a product is sold (and then warn or protect consumers); and to recall a product if a defect is discovered later. The Retailers, however, did not do so and have not done so to this very day, despite having been sued in asbestos cases beginning no later than the 1990s to early-to-mid 2000s and despite the fact that the Retailers' insurers began including asbestos exclusions to their policies due to the Retailers' sale of cosmetic talcum powder products, putting the Retailers on further notice of the hazards.

The Retailers willfully failed to investigate the knowable and known asbestos-related hazards of the cosmetic talc products that they sold, including Defendants' talcum powder products. The Retailers had no reason to believe that Defendants' talcum powder products that they sold were

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

different from that sold by any other retailers – e.g., the Retailers did not request special bottles that contained talc from any different mine. The Retailers did not ask the manufacturers, marketers and distributors for any information relating to the hazards of Defendants' talcum powder products. The Retailers did not and do not hire their own scientists to evaluate the safety of the products that they sell – instead, the Retailers trust manufacturers and suppliers to satisfy any FDA requirements or industry standards. The Retailers' efforts to ensure product safety extend only to their handling and storage practices.

The Retailers use software programs to maintain the talcum products' safety data sheets that they receive from the manufacturers. The Retailers likewise rely upon the manufacturers to label the products. The Retailers do not investigate whether the labels are accurate or legally sufficient. Before the Retailers begin selling any product, the manufacturer must provide a safety data sheet to the Retailers and/or the Retailers' vendors. But neither the Retailers, nor anybody on their behalf, performs any independent review of the substance of these safety data sheets.

Despite Retailers' actual and constructive knowledge of the hazards of asbestos in talcum powder products, the Retailers further chose to market and distribute their own "generic" brand of talcum powder products. The Retailers marketed their generic talcum powder products under their own brand name, and furthermore, controlled every aspect of the generic manufacturing, packaging, and labelling. Although the Retailers were aware that they could manufacture their powder products without asbestos-contaminated talc (by using corn starch), the Retailers specifically chose to use talcum powder to achieve cost-savings in their generic powder products. When packaging and labelling their generic talcum powder products, the Retailers specifically chose to not include warnings related to the hazards of asbestos—warnings that end-consumers, including Plaintiff, would have received and heeded. Moreover, the Retailers failed to pass on warnings they specifically received through safety data sheets—acting with conscious malice toward end consumers, including Plaintiff, by failing to pass on warnings regarding the dangers of talc and asbestos that they specifically received. As a result of the Retailers failure to pass on these warnings, Plaintiff purchased and used talcum powder products resulting in his exposure to asbestiform fibers that were a substantial factor in causing his malignant mesothelioma.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  All Defendants are liable for fraudulent concealment, fraudulent misrepresentation, and
2  conspiracy to defraud. A conspiracy to defraud involves an agreement, a wrongful act by any of the
3  conspirators pursuant to the agreement, and damages.

4  Here, the Defendants are liable for fraudulent concealment, fraudulent misrepresentation,
5  and conspiracy to defraud (under theories of both concealment and misrepresentation), including
6  because the Defendants, their "alternate entities", and each of them suppressed from all consumers
7  and users, including Plaintiff, medical and scientific information concerning the health hazards
8  associated with inhalation of asbestos, including the substantial risk of injury or death therefrom.
9  Although the Defendants, and each of them knew of the substantial risks associated with exposure
10 to asbestos, they willfully and knowingly concealed such information of the Defendants' Products
11 from workers, users, handlers, bystanders, and household members in conscious disregard of the
12 rights, safety and welfare of "exposed persons", including Plaintiff.

13  The Defendants, their "alternate entities", and each of them, belonged to, participated in, and
14 financially supported industry organizations including, but not limited to, the Cosmetic Toiletry and
15 Fragrance Association ("CTFA") (now Personal Care Products Council). The CTFA was a national
16 association in the United States representing designers, manufacturers, and sellers of cosmetic
17 products and ingredients – including talc powder. The CTFA's members were responsible for
18 approximately 85 percent of the cosmetic products distributed in the United States. For talc-related
19 matters, the CTFA organized and acted through its Talc Subcommittee. The members of the Talc
20 Subcommittee included the Defendants, and several other corporations that were responsible for
21 other cosmetic talc products.

22  With respect to Plaintiff – who bought and used the final cosmetic talc products of the
23 Defendants – the conspirators included the Defendants, and the other corporations that participated
24 in the CTFA and its Talc Subcommittee. The conspirators' joint motive was to protect the profitable
25 market for their asbestos-containing talc powder, rather than to protect the safety of Plaintiff and
26 other consumers. The conspirators together agreed to fraudulently conceal and misrepresent the
27 asbestos-related hazards of their own, as well as each other's, cosmetic talc products. Each of the
28 conspirators then committed such fraud against Plaintiff and other consumers, as well as against

1  governmental entities (including the FDA and the National Toxicology Program) that, in an effort

2  to protect the safety of consumers, periodically investigated the asbestos content of the conspirators'

3  cosmetic talc products. As a result of that successful conspiracy to defraud consumers and

4  governmental entities, Plaintiff for many years was exposed to asbestos from the Defendants' and

5  the other conspirators' cosmetic talc products, which then caused Plaintiff to develop mesothelioma.

6       The following documents illustrate how the Defendants and the other conspirators formed

7  and executed their conspiracy to defraud from the early 1960's through present day:

8  1.    The FDA's July 8, 1971 memorandum discussed "Contamination of Talc
9        with Asbestos." The FDA wanted to know the best technologies to test for
        the "identity, quantitation, and particle size distribution of any asbestos that
10       may be present in talc." Some options included light microscopy, electron
11       microscopy, and x-ray diffraction scanning. The FDA planned to consult
        with independent scientists, including from Mt. Sinai School of Medicine,
        as well as with WCD and other talc-industry members.
12
13  2.   Avon's December 10, 1971 memorandum regarding "Asbestos and Talc"
        included a summary of the FDA's public meeting that had occurred on
14       August 3, 1971. The FDA believed that "most talcum powders of major
        manufacturers are relatively free of asbestos. Nevertheless, on behalf of
15       consumers, FDA is working on the details of a laboratory procedure for the
16       analysis of asbestos in talcum powders which will give consistent
        meaningful results." The FDA believed that accurate results would require
17       "use of a battery of specialized instruments and techniques, including x-ray
        diffraction, polarizing optical microscopy, electron microscopy, and
18       electron diffraction of selected particles." Without such a methodology, the
        FDA believed that the agency was not "in a position to determine if such
19       products on the market contain asbestos fibers." The Consumers Union
        expressed its hope that "existing knowledge on the subject of asbestos and
20       talc would be resolved in the interest of the consumer rather than in the
        interest of the producer." And the CTFA reported (falsely) that the
21       "Association was ready to join with FDA and the academic community to
        determine if there is a consumer safety problem with talc."
22
23  3.   Avon's March 28, 1972 memorandum regarding "Asbestos and Talc – FDA
        Position" discussed that the CTFA had recommended to the FDA the use of
24       x-ray diffraction scanning at a "1% sensitivity level for asbestos in talc."
        The FDA initially would hire Dr. Lewin of New York University as a
25       consultant to test approximately 100 cosmetic talc products (including
26       Avon's) using that method.

27  4.   The FDA's July 20, 1972 memorandum discussed background information
        on "Asbestos in Talc." "A number of sources have reported the presence of
28       asbestos fibers in talc. This asbestos is generally present as a natural

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

15

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

contaminant in talc deposits. The amount varies within deposits and among different geographical areas. There are talc deposits which are essentially free of asbestos fibers." The FDA understood that various techniques can help to determine if asbestos is present in talc. For example, x-ray diffraction scanning can help to determine mineral percentages, but cannot "give any idea of the number [or] size of fibers present." And optical microscopy can detect fibers, but cannot always identify their type.

5.    Dr. Lewin's August 3, 1972 report to the FDA showed that 43 of the 102 tested cosmetic talc products contained detectable levels of asbestos minerals by x-ray diffraction scanning. Avon's two products (Sample Nos. 62 and 101) each contained tremolite; and many other products contained tremolite and/or chrysotile.

6.    The FDA's August 11, 1972 memorandum summarized the FDA's meeting with the CTFA regarding Dr. Lewin's test results. Avon and other companies, along with Dr. Lewin, also attended the meeting. The FDA explained that Dr. Lewin's findings would become public as the FDA considered whether to enact regulations regarding asbestos in cosmetic talc products. But the CTFA "**strongly objected to the possibility that FDA would make the analytical results public in such a way as to give brand names and manufacturers. [CTFA]** indicated that such a disclosure of randomly selected samples in the market place would result in a great economic hardship for the companies involved and their employees." [Emphasis added.] CTFA threatened "**to take legal action to prevent public disclosure.**" [Emphasis added.] And instead of enacting any regulations, the CTFA urged the FDA to accept "voluntary industry compliance" with industry's own testing standards. Regarding the hazards of any asbestos in talc, "[t]here was no disagreement between FDA and industry scientists present at this meeting about the potential safety hazard that the presence of asbestos in talc containing cosmetic product poses to the consumer."

7.    The CTFA's December 21, 1973 memorandum summarized the CTFA's private December 7, 1973 Talc Subcommittee meeting. Avon and other companies attended the meeting. They discussed their recent round robin testing for asbestos in talc samples using the "Proposed FDA Method" of optical microscopy. The method detected chrysotile asbestos, but inconsistently. "Modification" of the method could make it more dependable. "It was agreed to urge FDA to defer finalizing the proposed optical microscopic method until it can be altered to be more reliable, or even replaced if necessary."

8.    The CTFA's December 10, 1973 internal report likewise summarized the CTFA's findings from its round robin testing. The FDA's proposed **optical microscopy** method "may be used with some modification" such as "better selection of R.I. [refractive index] liquids and reduction of sample size per slide." By contrast, **x-ray diffraction scanning** methods normally had a best-case detection limit of <u>one percent by weight</u> of tremolite asbestos

16

minerals in a talc sample; it <u>could not</u> "distinguish fibrous from non-fibrous" particles; and it <u>could not</u> reliably detect chrysotile asbestos minerals because of "chlorite interference." The CTFA concluded that **transmission electron microscopy "appears to offer the best, most reliable method and is probably capable of detecting chrysotile and tremolite (fibrous), both at a level of 0.1%."** [Emphasis added.] But instead of recommending TEM, the CTFA would ask the FDA for a "postponement of the finalization of the proposed regulation on talc," to allow time for a "a collaborative effort between FDA & industry to resolve a satisfactory method of estimating chrysotile and tremolite in talc."

9.    Two weeks later, the CTFA's December 26, 1973 letter to the FDA stated that it was "premature for FDA to impose its proposed optical method," and the CTFA (falsely) pledged to "assist" the FDA in "method development research."

10.   The CTFA's February 19, 1974 memorandum summarized the CTFA's private meeting of its Task Force on Methodology for the Detection of Asbestos in Talc. Avon and other companies attended the meeting. They discussed that with **transmission electron microscopy**, chrysotile asbestos **"is estimated easily at 0.1% by weight,"** and that **"at 0.1% chrysotile the fibers are readily apparent in every exposure and can be readily estimated in a matter of minutes."** [Emphasis added.] **"The method is suitable in situations where a great number of different talc specimens are to be studied."** [Emphasis added.]

11.   The CTFA's August 19, 1974 memorandum summarized the CTFA's private meeting of its subcommittee on Asbestos in Talc. Avon and other companies attended the meeting. They discussed their latest round robin testing, which detected chrysotile and tremolite asbestos minerals in talc samples. Additionally, the CTFA knew that the FDA was now "leaning heavily toward" x-ray diffraction scanning, and was "about ready to abandon their original proposed optical microscope technique." As for x-ray diffraction scanning, **"Once again, the limit to be suggested to FDA is 1%, with which we can live"** – the CTFA could live with that <u>because</u> tremolite asbestos normally was present in cosmetic talc products at levels below one percent, and because the method could not reliably detect chrysotile asbestos. [Emphasis added.]

12.   The CTFA's December 4, 1974 memorandum summarized the CTFA's private meeting of its Talc Subcommittee. Avon and other companies attended the meeting. They discussed that the CTFA would recommend to the FDA the use of x-ray diffraction scanning with its one-percent detection limit for tremolite asbestos minerals, with optical microscopy serving only as a "back-up" to doublecheck only <u>positive</u> results. The CTFA would not recommend transmission electron microcopy because, although **"<u>theoretically</u> [it] is satisfactory,"** a **"disadvantage[]"** was that its **"ultra sensitivity could be a problem"** – i.e., the CTFA disfavored transmission

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

17

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

electron microscopy <u>because</u> it detected asbestos in cosmetic talc products <u>too</u> effectively. [Bolded emphasis added.]

13.     A December 17, 1974 J&J memorandum discussed that the CTFA's talc task force had decided what test methods would be recommended to the FDA for "determining the presence of chrysotile and tremolite in talc. **We believe it is critical for the C.T.F.A. to now recommend these methods to the F.D.A. before the art advances to more sophisticated techniques with higher levels of sensitization.**" [Emphasis added.]

14.     The next month, the FDA's January 7, 1975 memorandum discussed the FDA's meeting with the CTFA on the "Status of Regulation(s) Regarding Asbestos in Talc." Industry first argued that chrysotile asbestos should not be the subject of any testing of talc, and <u>misstated</u> that "regulation was unnecessary because evidence indicates that chrysotile does not occur in talc." Industry further <u>misstated</u> that it was "sure there was no chrysotile present in cosmetic grade talc," and again <u>misstated</u> that "they could not find talc which contained chrysotile." Next, industry <u>misstated</u> that "analysis for amphibole (tremolite) minerals by x-ray diffraction was a reliable method with a sensitivity of 0.5%," and so the industry would determine tremolite content by that method. Moreover, the industry argued that "self-regulation" should be permitted instead of enacting any actual regulations.

15.     Likewise, a February 13, 1975 J&J memorandum discussed a meeting among the CTFA and FDA that had occurred on February 7, 1975. Industry again <u>misstated</u> that chrysotile asbestos did not exist in cosmetic products. Plus, the industry again requested that the FDA allow "self-regulatory action" as to any testing for asbestos in talc.

16.     Similarly, the CTFA (via Bristol-Myers) sent a September 17, 1975 letter to the FDA, and again <u>misstated</u> that chrysotile asbestos did not exist in cosmetic talc products; and that the companies purportedly made a "sincere and continuous effort to regulate our industry so that it will provide good and safe products to its customers."

17.     Next, the CTFA's September 23, 1975 letter to the FDA provided a copy of the industry's proposed test method for asbestos in talc. It relied upon x-ray diffraction scanning for amphiboles only (not chrysotile), with a stated detection limit of 0.5 percent. And only if a <u>positive</u> result occurred by x-ray diffraction scanning, then optical microscopy was used as a back-up method. Transmission electron microscopy was not included, and the CTFA <u>concealed</u> the fact that it disfavored that method because of its "ultra sensitivity" for detecting tremolite and chrysotile asbestos in talc. The CTFA instead <u>misstated</u> that transmission electron microscopy was just too impractical.

18.     The FDA's February 27, 1976 memorandum discussed the FDA's meeting with a reporter from the Washington Post regarding the "current status of

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

our efforts with regard to the regulation of asbestos in cosmetic talc products." The FDA had been persuaded (by the CTFA's concealment and misrepresentations) that x-ray diffraction scanning for tremolite was "suitable for routine quality control of talc," and that transmission electron microscopy was "not a suitable method for routine evaluation of talc because of the time-consuming methodology." Additionally, the FDA had abandoned its proposed regulation for optical microscopy because the FDA had been persuaded (again, by the CTFA's concealment and misrepresentations) that the method was "unsatisfactory for the aforementioned reasons." The FDA had no further "regulatory plans."

19.    Similarly, a March 11, 1976 newspaper report, "Talc Tests Wanting, FDA Experts Admit," was published in the Record in Bergen County, New Jersey. The FDA official stated that (because of the CTFA's concealment and misrepresentations) the FDA trusted the cosmetic talc industry's assurances that it was "concerned about the asbestos content of their product." Plus, the FDA was not equipped to challenge the industry because "'the FDA lacks the legal authority, the man power, and the money to adequately protect the public [from] potentially hazardous cosmetics.'" "'Every cosmetic that goes on the market should be test[ed] . . . The law today merely prevents manufacturers from introducing adulterated or misbranded products.' 'The entire cosmetics budget, is only 2-1/2 million, and we have only 8 chemists. There are 250,000 different cosmetic products on the market and 4000-5000 manufacturers. We have 1% of the total FDA budget.' . . . 'We cannot test every sample.'"

20.    At the same time, the CTFA's March 11, 1976 memorandum summarized a meeting of its Talc Task Force. Avon and other companies attended the meeting. They discussed that each company should provide to the FDA asbestos testing data as to their recent cosmetic talc products. The CTFA would gather letters from each company and then submit them to the FDA at an upcoming meeting on March 15, 1976.

21.    The CTFA and its members then indeed wrote and submitted letters to the FDA on March 15, 1976 – purporting to "demonstrate responsibility of industry in monitoring its talcs. We are certain that the summary will give you assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products." Each company misrepresented that their cosmetic talc products were adequately tested and free of asbestos; and each company concealed that their products in fact were not adequately tested and that they contained traces of asbestos. Avon's March 12, 1976 letter to the FDA misstated that Avon's identified negative test results by x-ray diffraction scanning reliably showed that Avon's cosmetic talc products were free of tremolite and chrysotile asbestos. Avon concealed its positive asbestos test results that were achieved by x-ray diffraction scanning and by other methods.

22.    The FDA's March 15, 1976 memorandum discussed the meeting that had occurred with the CTFA. Avon and other companies attended the meeting.

19

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Industry reiterated that it would test for asbestos by x-ray diffraction scanning, with a detection limit of .5 percent at best for amphiboles. Industry stated that it would not test for asbestos by transmission electron microscopy, <u>misstating</u> that the method was not suitable because of its complexity and cost, and <u>concealing</u> that the method was not suitable to them because it detected tremolite and chrysotile asbestos too well. The FDA requested that the "industry voluntarily report the results of any sampling program to the FDA on a regular basis."

23.    The FDA's March 18, 1976 memorandum discussed that "though the submission by the CTFA Talc Subcommittee looks impressive at first hand, it does not offer much assurance that cosmetic talcs are adequately tested for asbestos. If this is all that can be expected from the cosmetic industry in the form of analytical effort in the light of the asbestos in talc publicity since 1971, we have not much choice but to move ahead as speedily as possible with a proposal of a regulation on asbestos in talc . . ." On March 19, 1976, FDA scientists asked the FDA Acting Director whether they may "prepare such a proposed regulation." But such approval was <u>never granted</u>.

24.    Meanwhile, the CTFA's March 31, 1976 memorandum summarized a meeting of the Talc Subcommittee. Avon and other companies attended the meeting. They "agreed on the success of the presentation of summary reports given to the FDA," and industry would "not obligate itself to give periodic reports to FDA." In the future, if the "time is right," industry might present more information to the FDA. Industry would not further address the FDA's request for voluntary sampling and reporting.

25.    Separately, on September 21, 1976, Avon wrote to the OSHA Compliance Office, which had asked about the "talcs we use at Avon." Avon <u>misstated</u> that since 1973 it had maintained adequate testing programs to "assure that the talcs we were using were asbestos-free."

26.    On October 7, 1976, the CTFA officially adopted its "J4-1" testing method for amphibole asbestos in talc. It relied upon x-ray diffraction scanning, with a .5 percent detection limit for amphibole asbestos only (not chrysotile asbestos). Optical microscopy was used as a back-up method only if a sample tested <u>positive</u> by x-ray diffraction scanning.

27.    The CTFA's October 18, 1976 memorandum discussed the next "Round-Robin Test on Talc Samples." Dr. Langer of Mt. Sinai would purchase bottles of talc, and then create sub-samples to be tested by different labs.

28.    On December 23, 1976, the CTFA (via J&J) sent "coded samples" of talc to each of the round robin testing participants, including Avon. The samples were to be tested for "asbestiform amphibole minerals" pursuant to the CTFA's J4-1 test method for x-ray diffraction scanning.

29.    J&J's April 21, 1977 letter to the round robin participants reported that three samples had failed the test – meaning that amphibole asbestos

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

minerals were present at levels above 0.5 percent. "**The sample code, which is still in my possession, has been released to no one.**" [Bolded emphasis added.] J&J called for a meeting to discuss "special training for the analysts and repeating the round robin."

30.    The CTFA's June 13, 1977 memorandum summarized the May 17, 1977 meeting where the CTFA discussed the results to-date of the round robin testing. Avon and other companies attended the meeting. Their objective was to "'**Test and verify CTFA Method J4-1 for this purpose – assurance that method is accurate, reliable and practical.' . . . these objectives have not yet been achieved.**" [Bolded emphasis added.] The CTFA therefore planned a round robin partial retest.

31.    J&J's March 1, 1978 letter to the CTFA enclosed the "table which breaks the code for the recently completed CTFA Task Force on Round Robin Testing of Consumer Talcum Products for Asbestiform Amphibole Minerals." Each participant would learn the results for "their product only." After the retest, no product was reported to contain "asbestiform" amphibole above 0.5 percent – any amphibole above that level was reported as "nonasbestiform." J&J would "**destroy the only other copy of this table,**" and the CTFA must "**Destroy your copy of the table.**" [Emphasis added.]

32.    The next month, the FDA's April 25, 1978 memorandum discussed "Asbestos in foods and cosmetics." The FDA remained "interested in having a method developed so that fractions of 1% of asbestos can be tested in foods or cosmetics." The FDA still believed the industry's misstatements that the optical microscopy method was "not a practical one." The FDA therefore did not pursue any regulations.

33.    Several years later, on November 8, 1983, a citizen petitioned the FDA to require cosmetic talc products to be labeled with an asbestos warning statement, information on asbestos particle size, and the proportion of talc impurities in the product.

34.    But in 1986, the FDA denied that petition because the FDA still trusted the industry's prior misstatements. The FDA noted it was "aware that some cosmetic talc produced in the 1960s and early 1970s did contain asbestiform minerals. However, your petition has not persuaded us that the cosmetic talc that is presently being produced contains significant amounts of asbestiform minerals." Without requesting any updated data from industry, and without performing any testing of its own, the FDA assumed that cosmetic talc products were pure.

35.    Several more years later, the CTFA's October 19, 1993 memorandum discussed industry responses to questions that would be raised at the upcoming symposium hosted by the FDA and the International Society of Regulatory Toxicology and Pharmacology. Avon and other companies were included in the discussion – and an August 5, 1993 receipt shows that Avon

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

contributed $2,000 for the project. As to how the industry "assure[s] talc is free of asbestos," the industry planned to <u>misstate</u> that "the conditions under which talc forms are dissimilar to the geologic conditions under which asbestos forms"; that the industry uses test methods that "provide adequate sensitivity <u>and</u> specificity"; and that "Cosmetic grade talc doesn't contain tremolite."

36.   Similarly, the CTFA's January 7, 1994 draft presentation/manuscript for that FDA/ISRTP symposium included additional industry misstatements. Avon and other companies received the draft. The industry planned to <u>misstate</u> that "talc deposits of commercial significance are rarely associated geologically with asbestos"; and that based on "rigorous quality assurance requirements, the likelihood of consumer exposure to asbestos in cosmetic grade talc is virtually nonexistent."

37.   After the symposium, a June 7, 1994 follow-up letter written by an FDA official who attended the symposium, addressed to the CTFA, shows that the CTFA indeed communicated its planned misstatements: "In your presentation at the Symposium, I thought I heard you say that talc and asbestos materials were not formed under the same geological conditions therefore the careful selection of mining sites results in asbestos-free talc. In a paper by Rohl, A.N., et al. (J. Toxicol. Environ. Health (1976) 2, 255-284) the authors said 'They [asbestos materials and talc] form in the same as well as similar geological processes. Consequently, many talc deposits contain asbestos minerals, so that in industrial and commercial use, such talcs always contain varying amounts of asbestos fibers.' **Which is true?**" Emphasis added.]

38.   Several years later, in 2002 (the final year that Avon made and sold cosmetic talc products) the CTFA made similar misstatements to the National Toxicology Program. In the CTFA's March 18, 2002 letter and attachment, the CTFA <u>misstated</u>, "In 1976, CTFA promulgated a specification for cosmetic talc to ensure that it is free of asbestos. As a practical matter, that specification is self-enforcing. Asbestos has been listed as a known human carcinogen, is highly regulated, and no consumer products company would knowingly run the risk of asbestos being present in its product, even in minute quantities. . . . CTFA promulgated its specification for cosmetic talc in 1976, which required a complete absence of detectable asbestos in cosmetic talc."

The Defendants and the other conspirators thus successfully avoided – through their fraudulent concealment and misrepresentations against consumers and governmental entities from the 1970's through 2000's – any meaningful public awareness or effective response to the talc/asbestos problem. As the FDA's website explains, the FDA <u>still</u> lacks legal authority to require adequate talc/asbestos testing by the industry, or to require disclosure of private industry data:

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  "Under the Federal Food, Drug and Cosmetic Act (FD&C Act), cosmetic products and ingredients,

2  with the exception of color additives, do not have to undergo FDA review or approval before they

3  go on the market. Cosmetics must be properly labeled, and they must be safe for use by consumers

4  under labeled or customary conditions of use. The law does not require cosmetic companies to share

5  safety information with FDA."

6

7  **FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY**

8  **I.**

9  Plaintiffs hereby incorporate by reference the allegations in the General Background section

10  of this Complaint as if fully stated herein.

11  **II.**

12  **Design Defect**: All Defendants (except Testing Defendants), and the 1st through 100th Doe

13  Defendants, are strictly liable, under the consumer-expectations test, for placing defectively

14  designed products into the stream of commerce, ultimately exposing Plaintiff to asbestos from these

15  products. First, Defendants designed, manufactured, supplied, marketed, distributed, and sold the

16  products. Second, each product did not perform as safely as an ordinary consumer would have

17  expected it to perform when used or misused in an intended or reasonably foreseeable way, because

18  each product caused hazardous asbestos to become airborne, exposing Plaintiff to asbestos. Third,

19  Plaintiff developed mesothelioma. Fourth, each product's failure to perform safely was a substantial

20  factor in causing Plaintiff's mesothelioma.

21  **III.**

22  **Failure-to-Warn Defect**: All Defendants (except Testing Defendants), and the 1st through

23  100th Doe Defendants, are strictly liable for placing products with failure-to-warn defects into the

24  stream of commerce, ultimately exposing Plaintiff to asbestos from these products. First, Defendants

25  designed, manufactured, supplied, marketed, distributed, and sold the products. Second, each

26  product had potential risks that were known or knowable in light of the scientific and medical

27  knowledge that was generally accepted in the scientific community at the time of design,

28  manufacture, supply, marketing, distribution, and sale. Third, the potential risks presented a

23

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  substantial danger when each product was used or misused in an intended or reasonably foreseeable
2  way, because each product caused hazardous asbestos to become airborne. Fourth, ordinary
3  consumers would not have recognized the potential risks. Fifth, Defendants failed to adequately
4  warn or instruct of the potential risks. Sixth, Plaintiff developed mesothelioma. Seventh, the lack of
5  sufficient warnings or instructions was a substantial factor in causing Plaintiff's mesothelioma.

6
7                      **SECOND CAUSE OF ACTION FOR NEGLIGENCE**
8                                              **I.**
9      Plaintiffs hereby incorporate by reference the allegations in the General Background
10  section of this Complaint as if fully stated herein.
11                                             **II.**
12      **General Negligence**: All Defendants, and the 1st through 100th Doe Defendants, are liable
13  for their general negligence. First, Defendants failed to use reasonable care to prevent harm to others
14  because they caused hazardous asbestos to become airborne, through Defendants' active
15  participation and contribution to specific activities that caused asbestos to become airborne. Second,
16  Defendants did so by unreasonably acting and failing to act. They acted in ways that a reasonably
17  careful person would not do in the same situation, and failed to act in ways that a reasonably careful
18  person would do in the same situation. Third, Plaintiff developed mesothelioma. Fourth, each
19  Defendant's general negligence was a substantial factor in causing Plaintiff's mesothelioma.
20                                             **III.**
21      **Negligence Per Se**: All Defendants, and the 1st through 100th Doe Defendants, are liable
22  for negligently violating the applicable state and federal asbestos regulations. Defendants
23  negligently violated those regulations by failing to properly label asbestos-containing products;
24  failing to monitor for the presence of asbestos dust; failing to provide changing facilities and
25  showers to exposed persons; allowing exposures of asbestos to exceed permissible exposure limits;
26  failing to warn as to the presence of asbestos; and failing to implement industrial hygiene practices
27  to eliminate or decrease exposures to asbestos. Those violations were a substantial factor in causing
28  Plaintiff's exposure to asbestos, and in causing Plaintiff's mesothelioma. The regulations were

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  designed to prevent overexposure to asbestos dust, and Plaintiff was within the class of persons that

2  the regulations were designed to protect. Accordingly, because Defendants violated the regulations,

3  Defendants' conduct is presumed to have been negligent.

4                                                    IV.

5          **Negligent Design, Marketing, Sale, Supply, Installation, Inspection, Repair, and**

6  **Removal of Products**: All Defendants, and the 1st through 100th Doe Defendants, are liable for

7  their negligent design, marketing, sale, supply, installation, inspection, repair, and removal of

8  products. First, Defendants designed, marketed, sold, supplied, installed, inspected, repaired, and

9  removed the products. Second, Defendants were negligent in designing, marketing, selling,

10 supplying, installing, inspecting, repairing, and removing the products because the products released

11 hazardous asbestos, which became airborne. Defendants failed to use the amount of care that a

12 reasonably careful person would use in similar circumstances to avoid exposing others to a

13 foreseeable risk of harm. Third, Plaintiff developed mesothelioma. Fourth, each Defendant's

14 negligence was a substantial factor in causing Plaintiff's mesothelioma.

15                                                    V.

16         `Negligent Failure to Warn about Products`: All Defendants, and the 1st through 100th Doe

17 Defendants, are liable for their negligent failure to warn about their products. First, Defendants

18 designed, manufactured, supplied, marketed, distributed, and sold the products. Second, Defendants

19 knew or reasonably should have known that each product was dangerous or was likely to be

20 dangerous when used or misused in a reasonably foreseeable manner, because each product caused

21 hazardous asbestos to become airborne. Third, Defendants knew or reasonably should have known

22 that users would not realize the danger. Fourth, Defendants failed to adequately warn of the danger

23 or instruct on the safe use of each product. Fifth, a reasonably careful person under the same or

24 similar circumstances would have warned of the danger or instructed on the safe use of each product.

25 Sixth, Plaintiff developed mesothelioma. Seventh, each Defendant's negligent failure to warn or

26 instruct was a substantial factor in causing Plaintiff's mesothelioma.

27                                                    VI.

28         **Negligent Failure to Recall and Retrofit Products**: All Defendants, and the 1st through

                                                    25

1  100th Doe Defendants, are liable for their negligent failure to recall and/or retrofit their products.

2  First, Defendants designed, manufactured, supplied, marketed, distributed, and sold the products.

3  Second, Defendants knew or reasonably should have known that each product was dangerous or

4  was likely to be dangerous when used in a reasonably foreseeable manner, because each product

5  caused hazardous asbestos to become airborne. Third, Defendants became aware of this defect

6  after they placed each product into the stream of commerce. Fourth, Defendants failed to recall

7  and/or retrofit each product. Fifth, a reasonably careful person under the same or similar

8  circumstances would have recalled and/or retrofitted each product. Sixth, Plaintiff developed

9  mesothelioma. Seventh, each Defendant's negligent failure to recall and/or retrofit each product

10  was a substantial factor in causing Plaintiff's mesothelioma.

11  ### THIRD CAUSE OF ACTION FOR FRAUD

12  ### I.

13      Plaintiffs hereby incorporate by reference the allegations in the General Background section

14  of this Complaint as if fully stated herein.

15  ### II.

16      All Defendants, and the 1st through 100th Doe Defendants, are liable for fraud, including

17  fraudulent   misrepresentation,   fraudulent   concealment,   conspiracy   to   commit   fraudulent

18  misrepresentation, and conspiracy to commit fraudulent concealment, as set forth herein.

19  ### III.

20  **Fraudulent Misrepresentation:** All Defendants, and the 1st through 100th Doe

21  Defendants, are liable for their fraudulent misrepresentations.

22      First, each Defendant, via its employees, agents, advertisements, or any other authorized

23  person or document, represented that certain facts were true when they were not.

24      Second, each Defendant falsely represented that the products they marketed, used, sold,

25  supplied, or specified for use were not hazardous; and/or that each Defendant's conduct did not

26  create serious or deadly dust hazards. Those misrepresentations were made before and during the

27  years that Plaintiff was exposed to asbestos for which Defendants are responsible. Those

28  misrepresentations were made either directly to Plaintiff, to a group of persons including Plaintiff,

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   or to third parties intending and reasonably expecting that the substance of those misrepresentations

2   would be repeated to Plaintiff.

3       Third, each Defendant knew that the misrepresentations were false when they made them,

4   or Defendants made the misrepresentations recklessly and without regard for the truth.

5       Fourth, each Defendant intended that Plaintiff and/or the same class of persons would rely

6   on the misrepresentations or their substance.

7       Fifth, Plaintiff and others reasonably relied on Defendants' misrepresentations or their

8   substance.

9       Sixth, Plaintiff developed mesothelioma.

10      Seventh, Plaintiff's and others' reliance on each Defendant's misrepresentations or their

11  substance was a substantial factor in causing Plaintiff's mesothelioma.

**IV.**

13      **Fraudulent Concealment:** All Defendants, and the 1st through 100th Doe Defendants, are

14  liable for their fraudulent concealment.

15      First, each Defendant made affirmative statements that were so misleading (e.g., misleading

16  "half-truths") that they gave rise to a fraud cause of action even in the absence of a specific

17  relationship or transaction as between Defendants and Plaintiff. Specifically, Defendants stated that

18  their products could be used safely while concealing that they were, in fact, lethal because they

19  released asbestos fibers; and/or Defendants stated that their conduct did not create serious or deadly

20  dust hazards, while concealing that Defendants' conduct in fact created risks of asbestos-related

21  cancer.

22      Second, each Defendant (i) had exclusive knowledge of material facts not known to Plaintiff

23  and others, (ii) actively concealed these material facts from Plaintiff and others, (iii) made partial

24  representations but also suppressed material facts, as set forth above, and (iv) made factual

25  representations, but did not disclose facts that materially qualified those representations. Such

26  nondisclosures included Defendants representing their products as safe when used as intended and

27  as fit for the particular purpose for which they were marketed, while not disclosing the facts that

28  these products contained asbestos that would become airborne during the intended and/or

27

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1 foreseeable use of the products, rendering them dangerous and unfit for their intended purpose.

2 Third, each Defendant entered into a relationship and/or a transaction with Plaintiff and
3 others sufficient to give rise to a duty to disclose. For example, Plaintiff and others used or otherwise
4 encountered Defendants' products that were purchased either directly from Defendants, Defendants'
5 authorized dealer or supplier, or any other entity upon which Defendants derived a direct monetary
6 benefit. Defendants also advertised and marketed their products to Plaintiff and other similar people.
7 Defendants also derived direct monetary benefit from the industry and these individuals' use of
8 these products because Plaintiff and others decided to use or purchase Defendants' products.

9 Fourth, Plaintiff and others did not know of the concealed facts.

10 Fifth, Defendants intended to deceive Plaintiff and others by concealing the facts, and/or
11 making certain representations without disclosing additional facts that would have materially
12 qualified those representations.

13 Sixth, had the omitted information been disclosed, Plaintiff and others reasonably would
14 have behaved differently.

15 Seventh, Plaintiff developed mesothelioma.

16 Eighth, each Defendant's concealment was a substantial factor in causing Plaintiff's
17 mesothelioma.

18

19 **V.**

20 **Conspiracy to Commit Fraudulent Misrepresentation**: All Defendants, and the 1st
21 through 100th Doe Defendants, are liable for their conspiracy to commit fraudulent
22 misrepresentation. First, Defendants were aware that their conspirators, which included all co-
23 Defendants and others, planned to commit fraudulent misrepresentation against Plaintiff and others.
24 Second, Defendants agreed with their conspirators and intended that the fraudulent
25 misrepresentation be committed. Third, Plaintiff developed mesothelioma. Fourth, each
26 Defendant's participation in the conspiracy was a substantial factor in causing Plaintiff's
27 mesothelioma.

28 **VI.**

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**Conspiracy to Commit Fraudulent Concealment**: All Defendants, and the 1st through 100th Doe Defendants, are liable for their conspiracy to commit fraudulent concealment. First, Defendants were aware that their conspirators planned to commit fraudulent concealment against Plaintiff and others. Second, these Defendants agreed with their conspirators and intended that the fraudulent concealment be committed. Third, Plaintiff developed mesothelioma. Fourth, each Defendant's participation in the conspiracy was a substantial factor in causing Plaintiff's mesothelioma.

## BASIS FOR PUNITIVE DAMAGES

### I.

**Malice, Oppression, or Fraud**: Plaintiffs hereby incorporate by reference the allegations in the General Background section of this Complaint, as well as the allegations of all causes of action, as if fully stated herein. All Defendants, and the 1st through 100th Doe Defendants, are liable for punitive damages because they engaged in the conduct that caused Plaintiff's harm with malice, oppression, or fraud.

First, Defendants committed malice in that they acted with intent to harm when they caused Plaintiff's asbestos exposures, and because their conduct was despicable and was done with a willful and knowing disregard for the rights and safety of others.

Second, Defendants committed oppression in that their conduct was despicable and subjected Plaintiff to cruel and unjust hardship in knowing disregard of Plaintiff's rights.

Third, Defendants committed fraud in that they intentionally concealed and misrepresented material facts and did so intending to harm Plaintiff.

Defendants' conduct constituting malice, oppression, or fraud was committed by, authorized by, or adopted by one or more officers, directors, or managing agents of each Defendant, who acted on behalf of each Defendant.

## PRAYER FOR DAMAGES

### I.

Plaintiffs pray for judgment against all Defendants, and the 1st through 100th Doe

29

1   Defendants, for:

2       1.      All economic and non-economic compensatory damages in excess of $35,000;

3       2.      Punitive damages according to proof;

4       3.      Pre- and post-judgment interest;

5       4.      Costs of suit; and

6       5.      Such other relief as is fair, just, and equitable.

7                               **DEMAND FOR JURY TRIAL**

8                                          **I.**

9       Plaintiffs hereby demand a trial by jury on all issues so triable.

10

11  DATED:  March 18, 2025                  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
                                            A Professional Law Corporation
12

13

14                                          By: _____
15                                              Joseph D. Satterley

16                                          Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| William H. Cross, Esq.   C.S.B. #337801<br>Kazan, McClain, Satterley & Greenwood, A Professional Law Corporation<br>Jack London Market, 55 Harrison St, Suite 400, Oakland CA 94607<br>TELEPHONE NO.: 510-302-1000          FAX NO.: 510-835-4913<br>EMAIL ADDRESS: wcross@kazanlaw.com<br>ATTORNEY FOR *(Name):* Plaintiffs | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Alameda<br>03/25/2025 at 08:07:19 PM<br>By: Abdul Kargbo,<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **ALAMEDA**
STREET ADDRESS: 1225 Fallon St.
MAILING ADDRESS: 1225 Fallon St.
CITY AND ZIP CODE: Oakland, 94612
BRANCH NAME: Renè C. Davidson Courthouse

CASE NAME: JOHN E. MARICICH, JR. and KYM MARICICH BENEDICT v.
CHATTEM, INC. etc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 25CV116787 |
|---|---|---|
| ☒ **Unlimited**  ☐ **Limited**<br>(Amount          (Amount<br>demanded        demanded is<br>exceeds $35,000)  $35,000 or less) | ☐ Counter   ☐ Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☒ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☒ is  ☐ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☒ Large number of separately represented parties
   b. ☒ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☒ Substantial amount of documentary evidence
   d. ☒ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. ☒ monetary b. ☐ nonmonetary; declaratory or injunctive relief c. ☒ punitive
4. Number of causes of action *(specify):* Three
5. This case ☐ is  ☒ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: March 18, 2025

William H. Cross
_____
(TYPE OR PRINT NAME)

▶  *(signature)* William H. Cross
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

| **Short Title:** JOHN E. MARICICH, JR. and KYM MARICICH BENEDICT v. CHATTEM, INC. etc., et al. | **Case Number:** |
|---|---|

### CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[ ] Hayward Hall of Justice (447)

[X] Oakland, Rene C.Davidson Alameda County Courthouse (446)    [ ] Pleasanton, Gale-Schenone Hall of Justice (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) |
|---|---|---|
| Auto Tort | Auto Tort (22) | [ ] 34 Auto tort (G)<br>**Is this an uninsured motorist case? [ ] yes [ ] no** |
| Other PI /PD /<br>WD Tort | Asbestos (04)<br>Product liability (24)<br>Medical malpractice (45)<br>Other PI/PD/WD tort (23) | [X] 75 Asbestos (D)<br>[ ] 89 Product liability (not asbestos or toxic tort/environmental) (G)<br>[ ] 97 Medical malpractice (G)<br>[ ] 33 Other PI/PD/WD tort (G) |
| Non - PI /PD /<br>WD Tort | Bus tort / unfair bus. practice (07)<br>Civil rights (08)<br>Defamation (13)<br>Fraud (16)<br>Intellectual property (19)<br>Professional negligence (25)<br>Other non-PI/PD/WD tort (35) | [ ] 79 Bus tort/ unfair bus. practice (G)<br>[ ] 80 Civil rights (G)<br>[ ] 84 Defamation (G)<br>[ ] 24 Fraud (G)<br>[ ] 87 Intellectual property (G)<br>[ ] 59 Professional negligence - non-medical (G)<br>[ ] 03 Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36)<br>Other employment (15) | [ ] 38 Wrongful termination (G)<br>[ ] 85 Other employment (G)<br>[ ] 53 Labor comm award confirmation<br>[ ] 54 Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06)<br>Collections (09)<br>Insurance coverage (18)<br>Other contract (37) | [ ] 04 Breach contract / Wrnty (G)<br>[ ] 81 Collections (G)<br>[ ] 86 Ins. coverage - non-complex (G)<br>[ ] 98 Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14)<br>Wrongful eviction (33)<br>Other real property (26) | [ ] 18 Eminent domain / Inv Cdm (G)<br>[ ] 17 Wrongful eviction (G)<br>[ ] 36 Other real property (G) |
| Unlawful Detainer | Commercial (31)<br>Residential (32)<br>Drugs (38) | [ ] 94 Unlawful Detainer - commercial  **Is the deft. in possession**<br>[ ] 47 Unlawful Detainer - residential  **of the property?**<br>[ ] 21 Unlawful Detainer - drugs    **[ ] Yes [ ] No** |
| Judicial Review | Asset forfeiture (05)<br>Petition re: arbitration award (11)<br>Writ of Mandate (02)<br><br>Other judicial review (39) | [ ] 41 Asset forfeiture<br>[ ] 62 Pet. re: arbitration award<br>[ ] 49 Writ of mandate<br>**Is this a CEQA action (Publ.Res.Code section 21000 et seq)  [ ]Yes [ ] No**<br>[ ] 64 Other judicial review |
| Provisionally<br>Complex | Antitrust / Trade regulation (03)<br>Construction defect (10)<br>Claims involving mass tort (40)<br>Securities litigation (28)<br>Toxic tort / Environmental (30)<br>Ins covrg from cmplx case type (41) | [ ] 77 Antitrust / Trade regulation<br>[ ] 82 Construction defect<br>[ ] 78 Claims involving mass tort<br>[ ] 91 Securities litigation<br>[ ] 93 Toxic tort / Environmental<br>[ ] 95 Ins covrg from complex case type |
| Enforcement of<br>Judgment | Enforcement of judgment (20) | [ ] 19 Enforcement of judgment<br>[ ] 08 Confession of judgment |
| Misc Complaint | RICO (27)<br>Partnership / Corp. governance (21)<br>Other complaint (42) | [ ] 90 RICO (G)<br>[ ] 88 Partnership / Corp. governance (G)<br>[ ] 68 All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] 06 Change of name<br>[ ] 69 Other petition |

202-19 (5/1/00)



# Superior Court of California, County of Alameda
# Alternative Dispute Resolution (ADR) Information Packet

The person who files a civil lawsuit (plaintiff) must include the ADR Information Packet with the complaint when serving the defendant. Cross complainants must serve the ADR Information Packet on any new parties named to the action.

---

The Court *strongly encourages* the parties to use some form of ADR before proceeding to trial. You may choose ADR by:

- Indicating your preference on Case Management Form CM-110;

- Filing the Stipulation to ADR and Delay Initial Case Management Conference for 90 Days (a local form included with the information packet); or

- Agreeing to ADR at your Initial Case Management Conference.

**QUESTIONS?** Call (510) 891-6055. Email: adrprogram@alameda.courts.ca.gov
Or visit the court's website at http://www.alameda.courts.ca.gov/divisions/civil/adr

---

### What Are the Advantages of Using ADR?

- *Faster* –Litigation can take years to complete but ADR usually takes weeks or months.

- *Cheaper* – Parties can save on attorneys' fees and litigation costs.

- *More control and flexibility* – Parties choose the ADR process appropriate for their case.

- *Cooperative and less stressful* – In mediation, parties cooperate to find a mutually agreeable resolution.

- *Preserve Relationships* – A mediator can help you effectively communicate your interests and point of view to the other side. This is an important benefit when you want to preserve a relationship.

### What Is the Disadvantage of Using ADR?

- *You may go to court anyway* – If you cannot resolve your dispute using ADR, you may still have to spend time and money resolving your lawsuit through the courts.

### What ADR Options Are Available?

- *Mediation* – A neutral person (mediator) helps the parties communicate, clarify facts, identify legal issues, explore settlement options, and agree on a solution that is acceptable to all sides.

   o **Court Mediation Program**: Mediators do not charge fees for the first two hours of mediation. If parties need more time, they must pay the mediator's regular fees.

Some mediators ask for a deposit before mediation starts which is subject to a refund for unused time.

- o **Private Mediation**: This is mediation where the parties pay the mediator's regular fees and may choose a mediator outside the court's panel.

- *Arbitration* – A neutral person (arbitrator) hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial and the rules of evidence are often relaxed. Arbitration is effective when the parties want someone other than themselves to decide the outcome.

  - o **Judicial Arbitration Program (**non-binding): The judge can refer a case, or the parties can agree to use judicial arbitration. The parties select an arbitrator from a list provided by the court.  If the parties cannot agree on an arbitrator, one will be assigned by the court. There is no fee for the arbitrator. The arbitrator must send the decision (award of the arbitrator) to the court. The parties have the right to reject the award and proceed to trial.

  - o **Private Arbitration** (binding and non-binding) occurs when parties involved in a dispute either agree or are contractually obligated. This option takes place outside of the courts and is normally binding meaning the arbitrator's decision is final.

### Mediation Service Programs in Alameda County

Low-cost mediation services are available through non-profit community organizations. Trained volunteer mediators provide these services.  Contact the following organizations for more information:


**SEEDS Community Resolution Center**
2530 San Pablo Avenue, Suite A, Berkeley, CA 94702-1612
Telephone: (510) 548-2377  Website: www.seedscrc.org
Their mission is to provide mediation, facilitation, training and education programs in our
diverse communities – <u>S</u>ervices that <u>E</u>ncourage <u>E</u>ffective <u>D</u>ialogue and Solution-making.


**Center for Community Dispute Settlement**
291 McLeod Street, Livermore, CA 94550
Telephones: (925) 337-7175 | (925) 337-2915 (Spanish)
Website: www.trivalleymediation.com
CCDS provides services in the Tri-Valley area for all of Alameda County.


*For Victim/Offender Restorative Justice Services*
**Catholic Charities of the East Bay: Oakland**
433 Jefferson Street, Oakland, CA 94607 Telephone: (510) 768-3100 Website: www.cceb.org Mediation sessions involve the youth, victim, and family members work toward a mutually agreeable restitution agreement.

**ALA ADR-001**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | *FOR COURT USE ONLY* |
|---|---|

. TELEPHONE NO.:                          FAX NO. *(Optional)*:
E-MAIL ADDRESS *(Optional)*:
ATTORNEY FOR *(Name)*:

**SUPERIOR COURT OF CALIFORNIA, ALAMEDA COUNTY**
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME

PLAINTIFF/PETITIONER:
DEFENDANT/RESPONDENT:

**STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR)
AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**

CASE NUMBER:

**INSTRUCTIONS:  All applicable boxes must be checked, and the specified information must be provided.**

This stipulation is effective when:

- All parties have signed and filed this stipulation with the Case Management Conference Statement at least 15 days before the initial case management conference.
- A copy of this stipulation has been received by the ADR Program Administrator, 24405 Amador Street, Hayward, CA 94544 or Fax to (510) 267-5727.

1.  Date complaint filed: _____. An **Initial Case Management Conference** is scheduled for:

    Date:                          Time:                          Department:

2.  Counsel and all parties certify they have met and conferred and have selected the following ADR process *(check one)*:

    ☐ Court mediation          ☐ Judicial arbitration
    ☐ Private mediation        ☐ Private arbitration

3.  All parties agree to complete ADR within 90 days and certify that:

    a.  No party to the case has requested a complex civil litigation determination hearing;
    b.  All parties have been served and intend to submit to the jurisdiction of the court;
    c.  All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
    d.  Copies of this stipulation and self-addressed stamped envelopes are provided for returning endorsed filed stamped copies to counsel and all parties;
    e.  Case management statements are submitted with this stipulation;
    f.  All parties will attend ADR conferences; and,
    g.  The court will not allow more than 90 days to complete ADR.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____          ▶ _____
(TYPE OR PRINT NAME)                  (SIGNATURE OF PLAINTIFF)

Date:

_____          ▶ _____

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA ADR-001 [New January 1, 2010]

**STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR)
AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**

Cal. Rules of Court,
rule 3.221(a)(4)

(TYPE OR PRINT NAME)                    (SIGNATURE OF ATTORNEY FOR PLAINTIFF)

**ALA ADR-001**

| PLAINTIFF/PETITIONER: | CASE NUMBER.: |
|---|---|
| DEFENDANT/RESPONDENT: | |

Date:

_____    ▶ _____
(TYPE OR PRINT NAME)                         (SIGNATURE OF DEFENDANT)

Date:

_____    ▶ _____
(TYPE OR PRINT NAME)                    (SIGNATURE OF ATTORNEY FOR DEFENDANT)

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA ADR-001 [New January 1, 2010]

**STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR)
AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**

Cal. Rules of Court,
rule 3.221(a)(4)

| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF ALAMEDA** | Reserved for Clerk's File Stamp<br><br>**FILED**<br>Superior Court of California<br>County of Alameda<br><br>03/25/2025<br><br>Chad Finke , Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>A. Kocab |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | |
| PLAINTIFF:<br>JOHN E. MARICICH, JR. et al | |
| DEFENDANT:<br>CHATTEM, INC., individually et al | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>25CV116787 |

TO THE PLAINTIFF(S)/ATTORNY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)).

Give notice of this conference to all other parties and file proof of service.

Your Case Management Conference has been scheduled on:

| | |
|---|---|
| Date: 08/07/2025     Time: 1:30 PM     Dept.: 18 | |
| Location: Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | |

TO DEFENDANT(S)/ATTORNEY(S) FOR DEFENDANT(S) OF RECORD:

The setting of the Case Management Conference does not exempt the defendant from filing a responsive pleading as required by law, you must respond as stated on the summons.

TO ALL PARTIES who have appeared before the date of the conference must:

Pursuant to California Rules of Court, 3.725, a completed Case Management Statement (Judicial Council form CM-110) must be filed and served at least 15 calendar days before the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.

**Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724.

**Post jury fees** as required by Code of Civil Procedure section 631.

If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30. Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

The judge may place a Tentative Case Management Order in your case's on-line register of actions before the conference. This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative case management orders at https://eportal.alameda.courts.ca.gov.

Expedited Jury Trials

If the parties agree, they may try the case in an Expedited Jury Trial. Code of Civ. Proc. § 630.01 et seq. In short, the parties would agree to the following: 8 jurors (6 must agree); 3 peremptory challenges per side; 5-hour time limit per side, unless otherwise agreed and approved; one to two court days for completion, unless otherwise agreed and approved; high/low arrangement option; and limited right to appeal. For additional information, please see the following links:

- EJT-010-INFO* Expedited Jury Trial Information Sheet (ca.gov)
- EJT-008 Agreement of Parties (Mandatory Expedited Jury Trial Procedures) (ca.gov)
- EJT-020 [Proposed] Consent Order for Voluntary Expedited Jury Trial (ca.gov)

**NOTICE OF**
**CASE MANAGEMENT CONFERENCE**

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>03/25/2025<br>Chad Finke, Executive Officer/Clerk of the Court<br>By: _A.H.Kargbo_ Deputy |
| PLAINTIFF/PETITIONER:<br>JOHN E. MARICICH, JR. et al | |
| DEFENDANT/RESPONDENT:<br>CHATTEM, INC., individually et al | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>25CV116787 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the attached document upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

Joseph D. Satterley
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
55 Harrison Street, Suite 400
Oakland, CA 94607

Chad Finke, Executive Officer / Clerk of the Court

Dated: 04/01/2025                    By:

_A. Kargbo, Deputy Clerk_

**CERTIFICATE OF MAILING**